[No. H035619. Sixth Dist. Apr. 6, 2011.]

CEDAR FAIR, L.P., Plaintiff and Appellant, v.
CITY OF SANTA CLARA et al., Defendants and Respondents;
FORTY NINERS STADIUM, LLC, Real Party in Interest and Respondent.

1152

1154

## Counsel

Hoge, Fenton, Jones & Appel, Sean A. Cottle and John A. Hickey for Plaintiff and Appellant.

Goldfarb & Lipman, Karen M. Tiedemann and Juliet E. Cox for Defendants and Respondents City of Santa Clara and Redevelopment Agency of the City of Santa Clara.

Coblentz, Patch, Duffy & Bass, Jonathan R. Bass and Charmaine G. Yu for Defendant and Respondent Forty Niners Stadium, LLC.

## Opinion

ELIA, J.—Cedar Fair, L.P., the owner and operator of the Great America amusement park located in Santa Clara (Cedar Fair), appeals from the judgment of dismissal that followed the court's order sustaining a demurrer without leave to amend to its petition for writ of mandate. Cedar Fair sought to compel the City of Santa Clara (City) and the City's redevelopment agency (Redevelopment Agency) to vacate their approvals of the "Stadium Term Sheet," which "set[] forth basic terms of a proposed transaction to develop a stadium . . . located in the City of Santa Clara that would be the home field of the San Francisco 49ers NFL franchise." According to the petition, "[t]he proposed stadium has a footprint of approximately 14 acres and the 49ers propose to locate the stadium on a 17-acre parcel that is subject to a long-term lease between the [Redevelopment] Agency (as landlord) and Cedar Fair (as tenant). Cedar Fair has three 10-year options remaining on the lease and currently uses this parcel site to provide parking for visitors to

Great America and for special events." Cedar Fair alleged that the term sheet approvals had to be set aside because no environmental impact report (EIR) had been prepared pursuant to the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) prior to the governmental approvals of the term sheet.[1] The trial court assumed, without deciding, that the petition for writ of mandate was timely filed but then determined that the term sheet did not constitute a project or a project approval and, therefore, preparation of an EIR was not required.

We affirm.

## A. *Procedural History*

On December 7, 2009, Cedar Fair filed a verified petition for writ of mandate seeking, among other things, to compel the City and Redevelopment Agency to set aside their approvals of the Stadium Term Sheet. The petition alleged that the city council, acting for the City and in its capacity as the legislative body of the Redevelopment Agency, approved the term sheet on June 2, 2009, and these approvals became final when the city council declined to reconsider the action at its next regular meeting on June 9, 2009. The petition recites certain statements contained in the May 29, 2009 city council agenda report regarding the background of the proposed stadium project and the purpose of the term sheet. It alleges that subsequent statements by city council members and City officers, representatives or staff, establish that respondents regarded the term sheet, notwithstanding its conditional language, as a binding commitment to the project and their approvals of the term sheet effectively precluded meaningful consideration of the stadium project's environmental impacts and potential alternatives.

The real party in interest, Forty Niners Stadium, LLC (49ers Stadium Company), demurred to the petition on the grounds that it failed to state a cause of action (Code Civ. Proc., § 430.10, subd. (e)) and that it was time-barred (Pub. Resources Code, § 21167, subd. (a)). 49ers Stadium Company requested the court to take judicial notice of the Stadium Term Sheet dated June 2, 2009. The City and Redevelopment Agency also demurred to the petition on the same grounds.

Petitioner initially requested the court to take judicial notice of Santa Clara City Council (City Council) resolutions Nos. 10-7700 and 10-7701, both passed on March 9, 2010, the July 6, 2009 agenda report, policy 042 of the City's policy and procedure manual, and the City Council's and the Redevelopment Agency's

---

[1] All further statutory references are to the Public Resources Code unless otherwise specified.

June 2, 2009, and June 9, 2009 agendas. Petitioner also requested that the court take judicial notice of the draft minutes of City Council's June 9, 2009 meeting and the summary of City Council actions taken at that meeting.

The June 2, 2009 and June 9, 2009 agendas stated in capital letters, before the list of agenda items: "Appeal of hearing decisions of the City Council must be made to the Superior Court within 90 calendar days of final action. Because of the agenda provision for reconsideration, final action is deemed to occur at the end of the next regular meeting pursuant to City Council Policy (P &P 042). (Code of Civil Procedure section 1094.6.)" Policy 042 set forth the applicable procedure to obtain reconsideration of council action.

The June 2, 2009 agenda for a special meeting of the joint City Council and Redevelopment Agency "Committee of the Whole" set forth the "term sheet" item of business and listed the requested actions: "a. Approve the Term Sheet between the City of Santa Clara, the Redevelopment Agency and the 49ers Stadium Company, LLC for the construction and operation of an NFL stadium and authorize the City Manager/Executive Director to execute the Term Sheet. [¶] b. Direct the City Manager/Executive Director to return to the June 23, 2009 City Council/Redevelopment Agency meeting with: [¶] 1) a report for City Council action to proceed with process of creating a Charter Review Committee; [¶] 2) an information report detailing the calendar of events necessary to have a Term Sheet ballot measure ready for a Spring 2010 election; [¶] c. Direct the City Manager/Executive Director to return to the July 14, 2009 City Council/Redevelopment Agency meeting with: [¶] 1) a presentation by the San Francisco 49ers on the design of the proposed stadium; [¶] 2) a report for City Council/Redevelopment Agency action to amend the existing Negotiating Agreement between the City of Santa Clara, the Redevelopment Agency and the 49ers Stadium Company, LLC in order to proceed with the next phase of the proposed stadium project, which is negotiation of the Disposition and Development Agreement; and [¶] 3) a proposed consultant budget for continuing staff support for the next phase of the stadium project." The June 9, 2009 agenda states as unfinished business: "Possible Reconsideration of Actions Taken at Immediately Preceding Meeting." The draft minutes of City Council's June 9, 2009 meeting and the summary of its actions at that meeting showed that the City Council took no action on a request that the council reconsider its June 2, 2009 approval of the term sheet.

The July 6, 2009 agenda report from the assistant manager, prepared for a July 14, 2009 meeting, concerned a proposed second amendment to the "Negotiating Agreement" between the City, the Redevelopment Agency, the San Francisco Forty Niners, LLC, and the 49ers Stadium Company. The report indicates that the Negotiating Agreement was approved by respondents

on February 12, 2008, and then extended by amendment on June 17, 2008. The report recommended that respondents approve the second proposed amendment extending the Negotiating Agreement to June 30, 2010. The report indicated that staff was working on the EIR for the proposed stadium project while negotiations to reach a disposition and development agreement (DDA) went forward. It stated: "The stadium project will not proceed unless and until the parties have negotiated, executed, and delivered mutually acceptable agreements based upon information produced from the CEQA environmental review process and from other public review and hearing processes, and subject to all applicable government approvals." The report also explained that "[a]mending the Negotiating Agreement still provides Council with an 'off ramp' to exit the stadium project if, at the end of the amended [negotiating] period, a DDA and associated documents cannot be negotiated between the City and the 49ers."

One of the March 9, 2010 resolutions, which included a recital that the City Council had certified the final EIR for the stadium project on December 8, 2009, adopted extensive CEQA findings concerning significant impacts, mitigation measures and alternatives and a statement of overriding considerations for the approval of general plan amendments relating to the stadium project. The other March 9, 2010 resolution approved the adoption of a general plan amendment amending the text of the tourist commercial designation of the land use element of the City's general plan.

In addition, Cedar Fair requested the court to take judicial notice of its separate writ petition challenging the EIR prepared for the proposed stadium project.

The court heard argument on April 30, 2010, and the matter was submitted for decision. In an order filed May 3, 2010, the court granted all requests for judicial notice. It then sustained the demurrer without leave to amend on the ground the petition failed to state sufficient facts to constitute a cause of action. It explained: "Having examined the judicially noticed 'Term Sheet' entered into between Respondents and Real Party the Court concludes that it is not a 'project' or a 'project approval' for CEQA purposes, and therefore its formation and/or approval by Respondents prior to the preparation of an EIR was not a CEQA violation. As this is the sole basis for the CEQA violation alleged in the Writ Petition . . . the claims fail to state sufficient facts."

A judgment of dismissal was filed May 18, 2010. Cedar Fair appeals.

B. *Standard of Review*

"In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all

material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' (*Serrano* v. *Priest* (1971) 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241].) Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. (*Speegle* v. *Board of Fire Underwriters* (1946) 29 Cal.2d 34, 42 [172 P.2d 867].) When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. (See *Hill* v. *Miller* (1966) 64 Cal.2d 757, 759 [51 Cal.Rptr. 689, 415 P.2d 33].)" (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) Generally, "[i]n reviewing an order sustaining a demurrer without leave to amend, 'the allegations of the complaint must be liberally construed with a view to attaining substantial justice among the parties.' (*Youngman* v. *Nevada Irrigation Dist.* (1969) 70 Cal.2d 240, 244–245 [74 Cal.Rptr. 398, 449 P.2d 462].)" (*Heckendorn* v. *City of San Marino* (1986) 42 Cal.3d 481, 486 [229 Cal.Rptr. 324, 723 P.2d 64].)

"It is not the ordinary function of a demurrer to test the truth of the plaintiff's allegations or the accuracy with which he describes the defendant's conduct. A demurrer tests only the legal sufficiency of the pleading. (*Whitcombe* v. *County of Yolo* (1977) 73 Cal.App.3d 698, 702 [141 Cal.Rptr. 189].)" (*Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 213–214 [197 Cal.Rptr. 783, 673 P.2d 660].) "[T]he question of plaintiff's ability to prove [the pleading's] allegations, or the possible difficulty in making such proof does not concern the reviewing court . . . ." (*Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496 [86 Cal.Rptr. 88, 468 P.2d 216].) On appeal, "[t]he judgment must be affirmed 'if any one of the several grounds of demurrer is well taken. [Citations.]' (*Longshore* v. *County of Ventura* (1979) 25 Cal.3d 14, 21 [157 Cal.Rptr. 706, 598 P.2d 866].)" (*Aubry* v. *Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967 [9 Cal.Rptr.2d 92, 831 P.2d 317].)

"Generally it is an abuse of discretion to sustain a demurrer without leave to amend if there is any reasonable possibility that the defect can be cured by amendment. (*Temescal Water Co.* v. *Department of Public Works* (1955) 44 Cal.2d 90, 107 [280 P.2d 1] . . . .)" (*Cooper* v. *Leslie Salt Co.* (1969) 70 Cal.2d 627, 636 [75 Cal.Rptr. 766, 451 P.2d 406].) When we review a demurrer "sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. (*Kilgore* v. *Younger* (1982) 30 Cal.3d 770, 781 [180 Cal.Rptr. 657, 640 P.2d 793]; *Cooper* v. *Leslie Salt Co.*[, *supra*,] 70 Cal.2d 627, 636 . . . .)" (*Blank* v. *Kirwan, supra*, 39 Cal.3d at p. 318.) "The burden of proving such reasonable possibility is squarely on the plaintiff. (*Cooper* v. *Leslie Salt Co., supra*, at p. 636.)" (*Ibid.*)

## C. *Failure to State a Cause of Action*

Appellant Cedar Fair argues that the approvals of the term sheet constituted "approval" of the stadium project within the meaning of CEQA and the implementing CEQA guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.; CEQA Guidelines)[2] that should have been preceded by preparation of an EIR under the analysis adopted in the California Supreme Court in *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116 [84 Cal.Rptr.3d 614, 194 P.3d 344] (*Save Tara*).

### 1. *Legal Background*

CEQA applies to "discretionary projects proposed to be carried out or approved by public agencies . . . ." (§ 21080, subd. (a).) " 'Project' means an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] (a) An activity directly undertaken by any public agency. [¶] (b) An activity undertaken by a person which is supported, in whole or in part, through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies. [¶] (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (§ 21065; see Cal. Code Regs., tit. 14, §§ 15357 [defining "discretionary project"], 15378 [defining "project"].) The term "project" "means the whole of an action" (Cal. Code Regs., tit. 14, § 15378, subd. (a)) and "refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies" (Cal. Code Regs., tit. 14, § 15378, subd. (c)). It "does not mean each separate governmental approval." (*Ibid.*)

Under CEQA, all local agencies must "prepare, or cause to be prepared by contract, and certify the completion of, an environmental impact report on any project that they intend to carry out or approve which may have a significant effect on the environment." (§ 21151; see § 21080, subd. (d).) "An environmental impact report is an informational document which, when its preparation is required by this division, shall be considered by every public agency prior to its approval or disapproval of a project. . . ." (§ 21061; see Cal. Code Regs., tit. 14, § 15004, subd. (a) ["Before granting any approval of a project subject to CEQA, every lead agency or responsible agency shall consider a final EIR or negative declaration or another document authorized

---

[2] "The CEQA Guidelines, promulgated by the state's Resources Agency, are authorized by Public Resources Code section 21083. In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 428, fn. 5 [53 Cal.Rptr.3d 821, 150 P.3d 709].)

by these guidelines to be used in the place of an EIR or negative declaration."].) "The purpose of an environmental impact report is to identify the significant effects on the environment of a project, to identify alternatives to the project, and to indicate the manner in which those significant effects can be mitigated or avoided." (§ 21002.1, subd. (a).)

In *Save Tara, supra,* 45 Cal.4th 116, the California Supreme Court addressed the question, when does a development agreement conditioned upon CEQA compliance constitute "approval" of a project that must be preceded by preparation of an EIR? It rejected any "bright-line rule defining when an approval [of a project] occurs . . . ." (45 Cal.4th at p. 138.)

### 2. *Save Tara v. City of West Hollywood*

In *Save Tara, supra,* 45 Cal.4th 116, "[t]wo nonprofit community housing developers . . . and a corporation they created for the purpose, Laurel Place West Hollywood, Inc. (collectively, Laurel Place), propose[d] to develop approximately 35 housing units for low-income seniors" on property owned by the City of West Hollywood. (*Id.* at p. 122.) The city council "voted to (1) approve a 'Conditional Agreement for Conveyance and Development of Property' between City and Laurel Place, including a $1 million City loan to the developer, in order to 'facilitate development of the project and begin[] the process of working with tenants to explore relocation options'; (2) authorize the city manager to execute the agreement 'substantially in the form attached'; and (3) have appropriate City commissions review 'alternative configurations' for the planned new building and obtain more public input 'on the design of project elements.' " (*Id.* at p. 124.) Under the draft conditional agreement, relocation of the tenants living on the property occurred during the first phase of actions. (*Ibid.*) The predevelopment portion of the city's loan to the developer was not subject to CEQA compliance. (45 Cal.4th at pp. 124–125.) Also, under the draft agreement, the city manager had the authority to waive several conditions precedent, including satisfaction of CEQA, to the city's obligations to convey the property and make the improvement portion of the loan. (45 Cal.4th at p. 124.)

After a CEQA action challenging approval of the draft agreement and loan to the developer was filed, the City of West Hollywood and Laurel Place executed a revised development agreement. (*Save Tara, supra,* 45 Cal.4th at p. 125.) It eliminated the city manager's authority to waive satisfaction of CEQA requirements and expressly recognized that the city retained complete discretion over actions necessary to comply with CEQA. (45 Cal.4th at p. 126.) The agreement stated details regarding tenant relocation. (*Id.* at p. 127.) The agreement "conditioned City's obligation to convey the property to Laurel Place for development on all applicable requirements of CEQA having been satisfied." (*Id.* at p. 132.)

 The California Supreme Court concluded that "[a] CEQA compliance condition can be a legitimate ingredient in a preliminary public-private agreement for exploration of a proposed project, but if the agreement, viewed in light of all the surrounding circumstances, commits the public agency as a practical matter to the project, the simple insertion of a CEQA compliance condition will not save the agreement from being considered an approval requiring prior environmental review." (*Save Tara, supra,* 45 Cal.4th at p. 132.) The court's analysis began with the statutory language of CEQA and the CEQA Guidelines.

Section 21100, subdivision (a) provides in pertinent part: "All lead agencies shall prepare, or cause to be prepared by contract, and certify the completion of, an environmental impact report *on any project which they propose to carry out or approve* that may have a significant effect on the environment."[3] (Italics added.) Section 21151, subdivision (a), similarly states: "All local agencies shall prepare, or cause to be prepared by contract, and certify the completion of, an environmental impact report on *any project that they intend to carry out or approve* which may have a significant effect on the environment. . . ."[4] (Italics added.)

The CEQA Guidelines define the word "approval": "(a) 'Approval' means the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person. The exact date of approval of any project is a matter determined by each public agency according to its rules, regulations, and ordinances. Legislative action in regard to a project often constitutes approval. [¶] (b) With *private* projects, approval occurs upon the earliest commitment to issue or the issuance by the public agency of a discretionary contract, grant, subsidy, loan, or other form of financial assistance, lease, permit, license, certificate, or other entitlement for use of the project." (Cal. Code Regs., tit. 14, § 15352, italics added.)

The Supreme Court also looked to the CEQA Guidelines concerning the time for CEQA compliance, which provides: "Choosing the precise time for

---

[3] " 'Lead agency' means the public agency which has the principal responsibility for carrying out or approving a project. The lead agency will decide whether an EIR or negative declaration will be required for the project and will cause the document to be prepared." (Cal. Code Regs., tit. 14, § 15367; see Cal. Code Regs., tit. 14, § 15050, subd. (a).) The criteria for identifying the lead agency for a project are set forth in the CEQA Guidelines. (Cal. Code Regs., tit. 14, § 15051.)

[4] The CEQA Guidelines define "local agency" to mean "any public agency other than a state agency, board, or commission." (Cal. Code Regs., tit. 14, § 15368.) The definition of "local agency" "includes but is not limited to cities, counties, charter cities and counties, districts, school districts, special districts, redevelopment agencies, local agency formation commissions, and any board, commission, or organizational subdivision of a local agency when so designated by order or resolution of the governing legislative body of the local agency." (*Ibid.*)

CEQA compliance involves a balancing of competing factors. EIRs and negative declarations should be prepared as early as feasible in the planning process to enable environmental considerations to influence project program and design and yet late enough to provide meaningful information for environmental assessment. [¶] (1) With public projects, at the earliest feasible time, project sponsors shall incorporate environmental considerations into project conceptualization, design, and planning. CEQA compliance should be completed prior to acquisition of a site for a public project. [¶] (2) To implement the above principles, public agencies shall not undertake actions concerning the proposed public project that would have a significant adverse effect or limit the choice of alternatives or mitigation measures, before completion of CEQA compliance. For example, agencies shall not: [¶] (A) Formally make a decision to proceed with the use of a site for facilities which would require CEQA review, regardless of whether the agency has made any final purchase of the site for these facilities, except that agencies may designate a preferred site for CEQA review and may enter into land acquisition agreements when the agency has conditioned the agency's future use of the site on CEQA compliance. [¶] (B) Otherwise take any action which gives impetus to a planned or foreseeable project in a manner that forecloses alternatives or mitigation measures that would ordinarily be part of CEQA review of that public project. [¶] (3) With private projects, the Lead Agency shall encourage the project proponent to incorporate environmental considerations into project conceptualization, design, and planning at the earliest feasible time." (Cal. Code Regs., tit. 14, § 15004, subd. (b).)

In *Save Tara, supra*, 45 Cal.4th 116, the city and the developer took the position that "approval" of a project for CEQA purposes was limited to "unconditional agreements irrevocably vesting development rights." (45 Cal.4th at p. 134.) The Supreme Court rejected that view, stating that "[s]uch a rule would be inconsistent with the CEQA Guidelines' definition of approval as the agency's '*earliest* commitment' to the project. (Cal. Code Regs., tit. 14, § 15352, subd. (b), italics added.)" (*Ibid.*) It explained: "Just as CEQA itself requires environmental review before a project's approval, not necessarily its *final* approval (Pub. Resources Code, §§ 21100, 21151), so the guideline defines 'approval' as occurring when the agency *first* exercises its discretion to execute a contract or grant financial assistance, not when the *last* such discretionary decision is made. [¶] Our own decisions are to the same effect: we have held an agency approved a project even though further discretionary governmental decisions would be needed before any environmental change could occur. [Citations.]" (*Id.* at pp. 134–135.)

The Supreme Court emphasized that "limiting approval to unconditional agreements that irrevocably vest development rights would ignore what we have previously recognized, that postponing environmental analysis can permit 'bureaucratic and financial momentum' to build irresistibly behind a

proposed project, 'thus providing a strong incentive to ignore environmental concerns.' (*Laurel Heights [Improvement Assn. v. Regents of University of California* (1988)] 47 Cal.3d [376,] 395 [253 Cal.Rptr. 426, 764 P.2d 278].)" (*Save Tara, supra*, 45 Cal.4th at p. 135.) It stated: "A public entity that, in theory, retains legal discretion to reject a proposed project may, by executing a detailed and definite agreement with the private developer and by lending its political and financial assistance to the project, have as a practical matter committed itself to the project. When an agency has not only expressed its inclination to favor a project, but has increased the political stakes by publicly defending it over objections, putting its official weight behind it, devoting substantial public resources to it, and announcing a detailed agreement to go forward with the project, the agency will not be easily deterred from taking whatever steps remain toward the project's final approval." (*Ibid.*) It further declared: ■ "When an agency reaches a binding, detailed agreement with a private developer and publicly commits resources and governmental prestige to that project, the agency's reservation of CEQA review until a later, final approval stage is unlikely to convince public observers that before committing itself to the project the agency fully considered the project's environmental consequences. Rather than a 'document of accountability' (*Laurel Heights I*, at p. 392), the EIR may appear, under these circumstances, a document of post hoc rationalization." (*Id.* at p. 136.)

■ On the other hand, the Supreme Court recognized that "[a]gencies sometimes provide preliminary assistance to persons proposing a development in order that the proposal may be further explored, developed or evaluated." (*Save Tara, supra*, 45 Cal.4th at p. 136.) It reasoned: "Not all such efforts require prior CEQA review. (See, e.g., Cal. Code Regs., tit. 14, § 15262 [conduct of feasibility or planning studies does not require CEQA review].) Moreover, privately conducted projects often need some form of government consent or assistance to get off the ground, sometimes long before they come up for formal approval. Approval, within the meaning of sections 21100 and 21151, cannot be equated with the agency's mere interest in, or inclination to support, a project, no matter how well defined. 'If having high esteem for a project before preparing an environmental impact statement (EIR) nullifies the process, few public projects would withstand judicial scrutiny, since it is inevitable that the agency proposing a project will be favorably disposed to it.' (*City of Vernon v. Board of Harbor Comrs.*[ (1988)] 63 Cal.App.4th [677,] 688 [74 Cal.Rptr.2d 497].)" (*Id.* at pp. 136–137.) The court agreed that "requiring agencies to engage in the often lengthy and expensive process of EIR preparation before reaching even preliminary agreements with developers could unnecessarily burden public and private planning." (*Id.* at p. 137.)

■ The Supreme Court adhered to "the general principle that before conducting CEQA review, agencies must not 'take any action' that significantly furthers a project 'in a manner that forecloses alternatives or mitigation measures that would ordinarily be part of CEQA review of that public project.' (Cal. Code Regs., tit. 14, § 15004, subd. (b)(2)(B); accord, [*Concerned McCloud Citizens v. McCloud Community Services Dist.* (2007)] 147 Cal.App.4th [181,] 196 [54 Cal.Rptr.3d 1] [agreement not project approval because, inter alia, it 'did not restrict the District's discretion to consider any and all mitigation measures, including the "no project" alternative']; *Citizens for Responsible Government*[ *v. City of Albany* (1997)] 56 Cal.App.4th [1199,] 1221 [66 Cal.Rptr.2d 102] [development agreement was project approval because it limited city's power 'to consider the full range of alternatives and mitigation measures required by CEQA'].)" (*Save Tara, supra,* 45 Cal.4th at p. 138.) The court instructed: "In applying this principle to conditional development agreements, courts should look not only to the terms of the agreement but to the surrounding circumstances to determine whether, as a practical matter, the agency has committed itself to the project as a whole or to any particular features, so as to effectively preclude any alternatives or mitigation measures that CEQA would otherwise require to be considered, including the alternative of not going forward with the project. (See Cal. Code Regs, tit. 14, § 15126.6, subd. (e).) In this analysis, the contract's conditioning of final approval on CEQA compliance is relevant but not determinative." (*Id.* at p. 139.) ■ Courts must "look both to the agreement itself and to the surrounding circumstances, as shown in the record of the decision, to determine whether an agency's authorization or execution of an agreement for development constitutes a 'decision . . . which commits the agency to a definite course of action in regard to a project.' (Cal. Code Regs., tit. 14, § 15352.)" (*Ibid.*) This analytical approach, however, "does not require CEQA analysis before a definite project has been formulated and proposed to the agency" or before a proposal "is well enough defined 'to provide meaningful information for environmental assessment.' (Cal. Code Regs., tit. 14, § 15004, subd. (b).)" (*Ibid.*)

In *Save Tara, supra,* 45 Cal.4th 116, the Supreme Court determined that "the City of West Hollywood's conditional agreement to sell land for private development, coupled with financial support, public statements, and other actions by its officials committing the city to the development, was, for CEQA purposes, an approval of the project that was required under sections 21100 and 21151 to have been preceded by preparation of an EIR." (*Id.* at pp. 121–122.) In reaching that conclusion, the court relied upon the stated purpose in the development agreements, "to 'cause the reuse and redevelopment' of 1343 Laurel in accordance with the project as outlined in the agreements and in the earlier HUD grant application" (*id.* at p. 140), and the statement of intent contained in the city council's resolution approving a

predevelopment loan to the developer, "to 'facilitate development of the project'—while allowing further public input on 'the design of project elements.' " (*Ibid.*)

The Supreme Court also relied upon the fact that the City of West Hollywood had agreed "to initially lend the developer nearly half a million dollars" and that loan was "*not* conditioned on CEQA compliance" and was "to be repaid from project receipts over a period of up to 55 years," which meant that the city would not be repaid if the city did not finally approve the project. (*Save Tara, supra*, 45 Cal.4th at p. 140.) Even though the development agreements "conditioned conveyance of the property and disbursement of the second half of the loan on CEQA compliance," the draft agreement "significantly circumscribed" and cast doubt upon the city's authority to act under CEQA. (45 Cal.4th at p. 140.) The court considered statements made by city officials and staff indicating that the city was committed to the project. (*Id.* at pp. 141–142.) Lastly, the court found significant that the development agreements provided for relocation of tenants, which was "a significant step in a redevelopment project's progress, and one that is likely to be irreversible." (*Id.* at p. 142.)

The court summarized: "[The] City's public announcements that it was determined to proceed with the development of low-income senior housing at 1343 Laurel, its actions in accordance with that determination by preparing to relocate tenants from the property, its substantial financial contribution to the project, and its willingness to bind itself, by the May 3 draft agreement, to convey the property if the developer 'satisfied' CEQA's 'requirements, as reasonably determined by the City Manager,' all demonstrate that City committed itself to a definite course of action regarding the project before fully evaluating its environmental effects. That is what sections 21100 and 21151 prohibit." (*Save Tara, supra*, 45 Cal.4th at p. 142.) The court clarified, however, that it was weighing the "statements by City officials not in isolation but as one circumstance shedding light on the degree of City's commitment when it approved the [development] agreements." (*Id.* at p. 142, fn. 13.)

*Save Tara* has been applied in *RiverWatch v. Olivenhain Municipal Water Dist.* (2009) 170 Cal.App.4th 1186 [88 Cal.Rptr.3d 625] (*Riverwatch*). That case involved an agreement between the water district (OMWD) and Gregory Canyon Ltd. (GCL) under which the "OMWD agreed to sell to GCL up to 244,000 gallons of recycled water per day for a term of up to 60 years" for use at a landfill owned by GCL. (*Id.* at p. 1196.) A section of the water agreement provided that it was "*GCL's* sole responsibility for complying with CEQA regarding GCL's receipt, use, and transportation of the recycled water it purchases from OMWD pursuant to the Agreement." (*Id.* at p. 1213.) The

agreement did not mention *"OMWD's* duties, as a responsible agency regarding the Landfill project, to comply with CEQA (i.e., by considering the final EIR certified by DEH [county department of environmental health] *before approving* and committing itself to the water delivery and construction activities provided for in the Agreement)." (*Id.* at p. 1214.)

The appellate court in *Riverwatch* concluded that the water district's "approval and signing of the Agreement constituted approval of part of the Landfill project within the meaning of CEQA and its guidelines, as interpreted by *Save Tara*" (*Riverwatch, supra,* 170 Cal.App.4th at p. 1212, fn. omitted) because "OMWD's approval and signing of the Agreement *committed* OMWD to a *definite course of action* and did not condition OMWD's performance of the Agreement on its subsequent exercise of its CEQA discretion to take other actions after considering the final EIR certified by DEH. (Cal. Code Regs., tit. 14, § 15352.)" (*Id.* at p. 1214, fn. omitted.) The court explained: "Because the Agreement set forth the specific details regarding OMWD's 60-year obligation to deliver recycled water to GCL, and the construction required to allow that delivery, OMWD's approval and signing of the Agreement satisfied the definiteness requirement (i.e., a *definite* course of action). Furthermore, when on February 17, 2006, OMWD's board approved the Agreement and OMWD's execution of the Agreement, OMWD clearly *committed* itself to the course of action set forth in the Agreement, which is a discretionary contract. Therefore, by February 17, 2006, OMWD made its earliest commitment to a definite course of action regarding its part of the Landfill project (i.e., to deliver up to 244,000 gallons of recycled water to GCL per day for a period of 60 years for use at the Landfill project site)." (*Id.* at p. 1212.) It also found significant that, "[a]lthough the Agreement contained a provision regarding CEQA responsibility, that provision did not, in any reasonable construction, provide that *OMWD* retained its complete discretion under CEQA (as a responsible agency) to consider a final EIR certified by DEH and thereafter approve or disapprove its part of the Landfill project pursuant to the Agreement or to require mitigation measures or alternatives to its part of the project." (*Ibid.*)

3. *Application of* Save Tara *to the Stadium Term Sheet*

In arguing that, as a practical matter, respondents committed themselves to the proposed stadium project by entering the Stadium Term Sheet agreement, appellant Cedar Fair emphasizes the term sheet's high level of detail, the large amount of money already invested by the Redevelopment Agency in the process of reaching an eventual final agreement, and the fact that the term sheet was put to a public vote by the City Council. Appellant argues that the approval of the very detailed term sheet served no purpose other than to show

that the City has effectively committed itself to the stadium project. According to appellant, this view is confirmed by subsequent statements made by officials, staff, and representatives of respondents.

Determining on which side of the *Save Tara* line the term sheet falls is not an easy judgment call. On one hand, the Stadium Term Sheet explicitly states that its purpose is "to memorialize the *preliminary* terms that have been negotiated among the parties, and to inform the public regarding the goals and principles identified by the City Staff and City Council that will guide the proposal to develop the Stadium throughout the public review process." (Italics added.) It provides that the "Stadium shall not proceed unless and until the parties have negotiated, executed and delivered mutually acceptable agreements based upon information produced from the CEQA environmental review process and on other public review and hearing processes and subject to all applicable governmental approvals." The term sheet's signature page states: "By signing below, the Parties evidence their general agreement with the provisions of this Term Sheet and agree to use this Term Sheet as the framework for the good faith negotiations of binding definitive agreements. Any agreements resulting from negotiations will become effective only if and after such agreement has been considered and approved by the Agency and the City following conduct of all legally required procedures."

On the other hand, the term sheet's introduction describes a well-defined proposed project: "The Stadium site is located in the Bayshore North Redevelopment Project Area . . . on the south side of Tasman Drive at Centennial Boulevard (the 'Stadium Site'). The Stadium will have a permanent seating capacity of approximately 68,500 seats with expansion to approximately 75,000 seats for larger events, such as an NFL Super Bowl. [¶] The Stadium will be owned by a joint powers authority comprised of the City and the [Redevelopment] Agency (the 'Stadium Authority'). . . . The City will ground lease the Stadium Site to the Stadium Authority which will, in turn, enter into a lease of the Stadium to the 49ers Stadium Company . . . . The 49ers Stadium Company will sublease the Stadium to the Team. Each of these leases will have an initial term of 40 years, with extension options that could extend the term up to another 20 years." The term sheet declares that "[t]he Stadium will further the City Council's goals of creating an entertainment destination in the Redevelopment Project Area, and will provide significant economic benefits to the City and its residents and businesses."

The body of the term sheet reiterates in an "Effect of Term Sheet" provision (art. 1, § 1.3) that the term sheet is not binding: "This Term Sheet is intended to provide a general framework for the subsequent negotiation of definitive agreements regarding the development and operation of the Stadium and is not intended to create any binding contractual obligations on any

Party or to commit any Party to a particular course of action. A transaction of this type involves many essential terms and conditions that have not yet been agreed upon, and it is expressly contemplated by the Parties that, in order to effectuate the Stadium project, binding agreements will have to be negotiated, agreed to by the Parties and ultimately submitted to the City Council for approval."

As to CEQA, the Stadium Term Sheet generally states that "the Stadium shall not proceed unless and until the parties have negotiated, executed and delivered mutually acceptable agreements based upon information produced from the CEQA environmental review process and on other public review and hearing processes and subject to all applicable governmental approvals." A provision concerning CEQA compliance (art. 1, § 1.2) states that "the City and the Agency retain the absolute sole discretion to (i) modify the transaction, create and enter into transactional documents, and modify the project as may, in their sole discretion, be necessary to comply with CEQA, (ii) select other feasible alternatives to avoid significant environmental impacts, (iii) balance the benefits of the Stadium project against any significant environmental impacts prior to taking final action if such significant impacts cannot otherwise be avoided, and/or (iv) determine not to proceed with the Stadium project. No legal obligations will exist unless and until the parties have negotiated, executed and delivered mutually acceptable agreements based upon information produced from the CEQA environmental review process and on other public review and hearing processes, subject to all applicable governmental approvals."

Another provision of the term sheet (art. 1, § 1.1) requires voter approval: "The Stadium will not be constructed unless and until the voters of the City approve a ballot measure endorsing the development of the Stadium consistent with the essential elements set forth in this Term Sheet."

Extensive details are set forth in the 39-page term sheet. "Article 2" specifies the city's responsibilities, which include the obligations to (1) jointly with the redevelopment agency, create the stadium authority to build, own, and operate the stadium, (2) enter into a ground lease with the stadium authority, and (3) engage in reasonable good faith efforts to form a Mello-Roos Community Facilities District for special taxation purposes. "Article 3" of the term sheet concerns the DDA. It states that the City and the stadium authority "will enter into a Disposition and Development Agreement ('DDA') with [the] 49ers Stadium Company," which "will set forth the predevelopment activities to be performed, the preconditions to commencement of construction of the Stadium," and will specify the "funding of construction costs." "Article 5" concerns the stadium lease and the 49ers NFL franchise sublease. The term sheet specifies the term of the leases (40 years

with five options for additional four-year terms) and the formula for calculating the rent to be paid by the 49ers Stadium Company to the stadium authority. "Article 6" concerns the design and construction of the stadium. It states that "[t]he Stadium Authority will enter into a project management agreement . . . with 49ers Stadium Company pursuant to which 49ers Stadium Company will direct and manage all design and construction for the Stadium, subject to oversight of the Stadium Authority . . . ." It also specifies the development fees to be paid by the 49ers Stadium Company and the redevelopment agency. "Article 7" addresses stadium construction financing.

The remainder of the term sheet is chiefly concerned with financial and other rights and responsibilities involved in the operation of the proposed stadium. "Article 8" sets forth responsibility for management and operation of the Stadium and parking. "Article 10" addresses entitlement to stadium operating revenue, which excludes team revenue. "Article 11" concerns team revenue. "Article 12" defines "reimbursable expenses." "Article 13" pertains to non-NFL events, including the income, revenue and expenses of such events. "Article 14" specifies the funding and maintenance of a capital reserve by the stadium authority. "Article 15" concerns use of excess revenues. "Article 16" describes the right of the 49ers Stadium Company to sublease to a second NFL team. "Article 17" concerns adjacent property, including the obligations of the Redevelopment Agency with respect to the Great America theme park.

Under *Save Tara*, the critical question is "whether, as a practical matter, the agency has committed itself to the project as a whole or to any particular features, so as to effectively preclude any alternatives or mitigation measures that CEQA would otherwise require to be considered, including the alternative of not going forward with the project. (See Cal. Code Regs, tit. 14, § 15126.6, subd. (e).)" (*Save Tara, supra*, 45 Cal.4th at p. 139.) In this respect, the term sheet is different from the conditional development agreements set forth in *Save Tara*, which conditionally committed the City of West Hollywood to take concrete actions toward realizing the development project. In contrast, the Stadium Term Sheet merely "memorialize[s] the preliminary terms" and only mandates that the parties use the term sheet as the "general framework" for "good faith negotiations." Under the express language of the term sheet agreement, the City and the Redevelopment Agency "retain the absolute sole discretion" to make decisions under CEQA, including deciding "not to proceed with the Stadium project," and the term sheet creates "[n]o legal obligations" "unless and until the parties have negotiated, executed and delivered mutually acceptable agreements based upon information produced from the CEQA environmental review process . . . ." The term sheet makes clear the parties' intent to not "create any binding contractual obligations" with respect to the development of the stadium or to commit any party to "a

particular course of action." The term sheet itself and the July 6, 2009 agenda report both recognized that a no-project option was still available.

 Thus, although the term sheet is extremely detailed, it expressly binds the parties to only continue negotiating in good faith. (See *Copeland v. Baskin Robbins U.S.A.* (2002) 96 Cal.App.4th 1251, 1253, 1255 [117 Cal.Rptr.2d 875] [recognizing cause of action for breach of agreement to negotiate in good faith].) A contract to negotiate an agreement is distinguishable from the ultimate agreement that parties hope to eventually reach. "If, despite their good faith efforts, the parties fail to reach ultimate agreement on the terms in issue the contract to negotiate is deemed performed and the parties are discharged from their obligations. Failure to agree is not, itself, a breach of the contract to negotiate." (*Id.* at p. 1257.)

The negotiation of a complicated, multiparty development agreement can involve a long process of hammering out a multitude of issues. (See *Copeland v. Baskin Robbins U.S.A., supra,* 96 Cal.App.4th at p. 1262 [recognizing that complex business agreements are not the product of "discrete offers, counteroffers and acceptances" but "result from a gradual flow of information between the parties followed by a series of compromises and tentative agreements on major points"].) Although the parties preliminarily agreed to numerous terms concerning the proposed stadium project, the term sheet did not make those terms binding or even conditionally binding. The commitment to continue negotiations pursuant to the term sheet is unlike the commitment in *Save Tara*, where the City of West Hollywood contractually bound itself to sell land for private development conditioned upon CEQA compliance, or *Riverwatch*, where the water district contractually bound itself to deliver water for 60 years.

Cedar Fair's petition did not allege any other agreements that concern the preliminary terms set forth in the term sheet or enlarge respondents' commitment under the Stadium Term Sheet. The petition contained several allegations seeking to show that respondents' approvals of the term sheet foreclosed meaningful CEQA review of the proposed stadium project. It alleged: "Statements made by members of the City Council and officers and representatives of the City and the Agency on and after June 2, 2009, show that the City and the Agency, by adopting the Term Sheet, (a) effectively circumscribed and limited their discretion with respect to environmental review and (b) devoted significant public resources to shaping the Project and encouraged bureaucratic and financial momentum to build irresistibly behind it." It averred: "Public statements by Santa Clara City Council members, Santa Clara City Manager Jennifer Sparacino, attorneys for the City, and other City staff members, as recorded on video and included in the official records of the City Council, demonstrate that the City and the Agency regard the Term Sheet as a

binding agreement committing the City and the Agency to the Project." The petition also stated: "The City's responses to the comments on the Draft EIR further demonstrate that the City views the Term Sheet as binding and will not allow the scope and terms of the Project to deviate from the Term Sheet. In response to the Draft EIR prepared by the City, Cedar Fair, the City of Cupertino, the City of Sunnyvale, the State Department of Transportation, the County of Santa Clara, the Santa Clara Valley Transportation Authority, and others identified feasible mitigation measures or alternatives to the Project that would lessen or avoid the Project's significant environmental impacts. Some of these mitigation measures and project alternatives would conflict with the Term Sheet but are otherwise feasible. However, the Final EIR prepared by the City does not adopt or recommend any mitigation measures or project alternatives that would conflict with the Term Sheet."

 Regardless whether persons speaking on behalf of respondents indicated that respondents regarded the term sheet as a binding agreement committing them to the proposed stadium project as alleged, the Stadium Term Sheet cannot be reasonably construed as creating any contractual commitment on the part of respondents to conditionally approve or undertake any aspect or feature of the stadium project because the language of the instrument is not reasonably susceptible of such an interpretation. "[T]he intention of the parties as expressed in the contract is the source of contractual rights and duties. A court must ascertain and give effect to this intention by determining what the parties meant by the words they used." (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 38 [69 Cal.Rptr. 561, 442 P.2d 641], fn. omitted.)

 "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co., supra*, 69 Cal.2d at p. 37.) An "ambiguity may be exposed by extrinsic evidence that reveals more than one possible meaning." (*Id.* at p. 40, fn. 8.) But "extrinsic evidence is not admissible in order to give the terms of a written instrument a meaning of which they are not reasonably susceptible. [Citations.]" (*Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 522 [67 Cal.Rptr. 761, 439 P.2d 889].)

Further, it is not alleged that respondents have made any contractual promises to loan money to a private developer as in *Save Tara*, let alone a loan that can be recovered only if the project is approved. (See *Save Tara, supra*, 45 Cal.4th at p. 140.) Appellant Cedar Fair now points to the July 6, 2009 agenda report, which indicated that over a million dollars of "RDA funds"

had been spent for "consultant support" and that an additional million was expected to be spent during the next phase of negotiations.[5] The judicially noticed document does not show that respondents committed any money to predevelopment or development of the stadium project pursuant to the term sheet or any other contractual obligation with 49ers Stadium Company. The fact that substantial sums may have been spent on consultant support is not surprising given the magnitude and complexity of the stadium project being negotiated as a private-public partnership. While such expenditures suggest that respondents were politically dedicated to the goal of developing an NFL stadium, those expenditures do not establish any legal commitment to any feature of the project that effectively foreclosed meaningful environmental review.

 The modern phenomenon of "public-private partnerships" for development makes the time of "approval" under CEQA more difficult to ascertain since a local agency may be a vocal and vigorous advocate of a proposed project as well as an approving agency. But "an agency does not commit itself to a project 'simply by being a proponent or advocate of the project . . . .' (*City of Vernon v. Board of Harbor Comrs.*[, *supra*,] 63 Cal.App.4th 677, 688 . . . , disapproved on other grounds in *Save Tara, supra,* 45 Cal.4th 116, 131, fn. 10.)" (*Parchester Village Neighborhood Council v. City of Richmond* (2010) 182 Cal.App.4th 305, 313 [105 Cal.Rptr.3d 736].) We return to the crucial question whether the term sheet, "viewed in light of all the surrounding circumstances," "as a practical matter," committed the City or the Redevelopment Agency "to the project as a whole or to any particular features, so as to effectively preclude any alternatives or mitigation measures that CEQA would otherwise require to be considered, including the alternative of not going forward with the project. [Citation.]" (*Save Tara, supra,* 45 Cal.4th at pp. 132, 139.) In this case, the term sheet, even considered together with the alleged circumstances, did not preclude any alternative or mitigation measure that would ordinarily be part of CEQA review.

In *Save Tara*, the Supreme Court eschewed the position that "any agreement, conditional or unconditional, would be an 'approval' requiring prior preparation of CEQA documentation if at the time it was made the project was sufficiently well defined to provide ' "meaningful information for environmental assessment." ' (*Citizens for Responsible Government v. City of Albany, supra,* 56 Cal.App.4th at p. 1221, quoting Cal. Code Regs., tit. 14, § 15004, subd. (b).)" (*Save Tara, supra,* 45 Cal.4th at p. 136.) In *Save Tara*, it

---

[5] The petition does not contain any allegations regarding respondents' expenditures for consultant support and we address this argument to assess whether additional allegations regarding such expenditures would render the petition legally sufficient.

rejected the idea that "once a private project had been described in sufficient detail, *any* public-private agreement related to the project would require CEQA review." (*Ibid.*)

On appeal, Cedar Fair maintains that respondents' statements and actions subsequent to their approval of the Stadium Term Sheet "demonstrate that the Agencies views [*sic*] the Term Sheet as binding and that the Agencies will not allow the scope and terms of the Project to deviate from the Term Sheet." It now points to the City Council's March 9, 2010 resolution approving a general plan amendment that changed the "tourist commercial" designation of the land use element to allow stadiums, arenas, sport and other cultural facilities and related parking. Appellant argues that, in approving that general plan amendment, "the City did not adopt a single mitigation measure that would require significant design changes to the Project."

This writ proceeding is not a challenge to the final EIR certified by the City Council on December 8, 2009, or the City Council's March 9, 2010 resolutions. (See § 21081, subd. (b); Cal. Code Regs., tit. 14, §§ 15064, 15091–15093.) This appeal does not call on us to consider whether those actions complied with CEQA. Moreover, those governmental actions, occurring many months after execution of the term sheet agreement that merely required the parties to continue negotiating in good faith, do not demonstrate that the preliminary agreement to the term sheet effectively ruled out any mitigation measure or alternative to the project.

 "CEQA does not, indeed cannot, guarantee that [governmental] decisions will always be those which favor environmental considerations." (*Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283 [118 Cal.Rptr. 249, 529 P.2d 1017].) "If economic, social, or other conditions make it infeasible to mitigate one or more significant effects on the environment of a project, the project may nonetheless be carried out or approved at the discretion of a public agency if the project is otherwise permissible under applicable laws and regulations." (§ 21002.1, subd. (c).) "CEQA recognizes that in determining whether and how a project should be approved, a public agency has an obligation to balance a variety of public objectives, including economic, environmental, and social factors and in particular the goal of providing a decent home and satisfying living environment for every Californian." (Cal. Code Regs., tit. 14, § 15021, subd. (d).) While "CEQA requires the decision-making agency to balance, as applicable, the economic, legal, social, technological, or other benefits . . . of a proposed project against its unavoidable environmental risks when determining whether to approve the project," "the adverse environmental effects may be considered 'acceptable' " "[i]f the specific economic, legal, social, technological, or other benefits . . . of a proposal project outweigh the unavoidable adverse environmental effects . . . ." (Cal. Code Regs., tit. 14, § 15093, subd. (a).)

Lastly, appellant maintains that, at this point in the writ proceeding, it is not required to provide any greater detail than pleaded regarding official statements since appellant does not yet have a certified administrative record and since, as the City "must have knowledge of the facts equal to that possessed by [appellant], . . . there is minimal need for particularity in the pleadings." It argues generally that "the record includes statements made by the City Manager and other City officials during public meetings and in agenda reports to the City Council indicating that, when the City negotiates the Disposition and Development Agreement and the long-term lease for the Project site, the City is unlikely to deviate from the terms of the Term Sheet."

■ "A party may seek a writ of mandate 'to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station . . . .' (Code Civ. Proc., § 1085, subd. (a).) In order to obtain writ relief, a party must establish ' "(1) A clear, present and usually ministerial duty on the part of the respondent . . . ; and (2) a clear, present and beneficial right in the petitioner to the performance of that duty . . . ." ' (*Santa Clara County Counsel Attys. Assn. v. Woodside* (1994) 7 Cal.4th 525, 539–540 [28 Cal.Rptr.2d 617, 869 P.2d 1142] . . . .)" (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 868 [62 Cal.Rptr.3d 614, 161 P.3d 1168].)

■ While Code of Civil Procedure section 1085 is available to compel a public agency to set aside a decision for failure to comply with CEQA (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 566 [38 Cal.Rptr.2d 139, 888 P.2d 1268]; see § 21168.5), "[i]t is incumbent upon the petitioner . . . to first state a prima facie case entitling the petitioner to relief. (*Sipper* v. *Urban* (1943) 22 Cal.2d 138 [137 P.2d 425].)" (*California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1155 [43 Cal.Rptr.2d 693, 899 P.2d 79].) "[T]o state a cause of action warranting judicial interference with the official acts of defendants, [the plaintiffs] must allege much more than mere conclusions of law; they must aver the specific facts from which the conclusions entitling them to relief would follow." (*Faulkner v. Cal. Toll Bridge Authority* (1953) 40 Cal.2d 317, 330 [253 P.2d 659].) ■ The allegations of the petition and the judicially noticed documents do not demonstrate that the term sheet, in light of surrounding circumstances alleged, committed respondents, as a practical matter, to a definite course of action with respect to development of a stadium and effectively ruled out any mitigation measure or alternative, including the alternative of not going forward with the project. As a consequence, the petition failed to state facts sufficient to show that approvals of the term sheet constituted an "approval" of the stadium project within the meaning of CEQA.

Since Cedar Fair's petition did not show it was entitled to extraordinary writ relief and since Cedar Fair did not demonstrate any reasonable possibility that the petition could be amended to render it legally sufficient, the trial court properly sustained the demurrer without leave to amend.[6]

## Disposition

The judgment is affirmed.

Rushing, P. J., and Premo, J., concurred.

---

[6] Given our conclusion, it is unnecessary to resolve the alternative ground for demurrer that this proceeding was time-barred.