Filed 5/31/13; partial pub. order 6/25/13 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| NEIGHBORS FOR FAIR PLANNING,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO,<br><br>    Defendant and Respondent;<br><br>BOOKER T. WASHINGTON COMMUNITY SERVICE CENTER,<br><br>    Real Party in Interest. | A135745<br><br>(City & County of San Francisco Super. Ct. No. CPF-11-511499) |

The City and County of San Francisco (the City) certified an environmental impact report and issued other approvals for a community center and affordable housing project (Project) proposed by real party in interest Booker T. Washington Community Service Center (the Center). The Project, if it goes forward, will involve the demolition of the Center's existing facility at 800 Presidio Avenue and its replacement with a mixed-use project with 48 units of affordable housing and an expanded and updated community center (the Project).

Plaintiffs, Neighbors for Fair Planning, are a group of local residents who oppose the Project, filed a petition for a writ of mandamus to set aside the City's certification of the final environmental impact report (EIR) and to invalidate its approval of a conditional use permit and special use district. The superior court denied the petition and plaintiffs appealed the ensuing judgment. Based on our independent review of the administrative

1

record, we conclude the City's actions are lawful and supported by substantial evidence.[1] Accordingly, we affirm.

## BACKGROUND

### A. The Project and Parties

The Center, a nonprofit organization founded in 1919, has occupied its present location in San Francisco's Western Addition neighborhood since 1952. It currently offers job training, after school and teen programs, recreation, counseling on housing and health care, and senior clubs, among other programs, to its ethnically diverse, low and very low-income clientele.

The Center proposes to demolish its existing facility, a one-story, 13,745 square foot community service building, and replace it with a 68,206 square foot mixed-use development containing expanded community facilities and a five-story residential building. The new community center would include a 7,506 square foot gymnasium, a child care center, and a state-of-the-art space to support the Center's programs for at-risk youth, with sufficient space to expand the Center's after-school and teen program from 100 to 150 participants. The housing component will provide 24 affordable studios for low income households, 24 additional studios for low to very low income emancipated foster youth ("transitional aged youth"), and two two-bedroom units for on-site managers.

Plaintiffs do not oppose replacing the current community center with a new facility, but have consistently advocated throughout the planning process for reducing its size, scope and density.

---

[1] We grant the City and the Center's joint motion to correct or augment the record with the record of the administrative proceedings, which plaintiffs should have designated and provided to this court pursuant to the procedure specified in rule 8.123 of the California Rules of Court. (Cal. Rules of Court, rules 8.120(a)(2), 8.123; see also rule 8.124(b)(3) ["An appendix must not: [¶] . . . [¶] (C) Contain the record of an administrative proceeding that was admitted in evidence, refused, or lodged in the trial court. Any such administrative record must be transmitted to the reviewing court as specified in rule 8.123."].)

**B. The Environmental Review and City Approval Process**

On June 23, 2010, The San Francisco Planning Department (the Department) published and circulated a Draft Environmental Impact Report (Draft) for the Project. The Draft addresses the Project's potential adverse impact on the neighborhood's character and physical environment, including its impacts on aesthetics and visual characteristics such as light, glare and views. The Draft also identifies and discusses two potential alternatives to the Project: a (1) no project alternative; and (2) a smaller, code compliant alternative that would contain 17 fewer residential units, more parking spaces, and one rather than two buildings to house both residential uses and the community center. In addition, the Draft describes two other alternatives the Department considered, but rejected as infeasible or failing to meet the project objectives: (1) a "preservation alternative," which would preserve the existing building with a four-story addition in the rear that would contain approximately 20 transitional aged youth housing units and a community room, office and storage; and (2) an "adaptive reuse alternative," which would replace the community center with 25 transitional aged youth units.

There was enormous community response to the proposal, both positive and negative. Scores of individuals and organizations weighed in. Prevalent among the concerns voiced by neighbors and community groups were the Project's size, scale and density, along with related concerns about its visual impacts and effects on traffic and parking. A number of individuals and neighborhood associations commented that they would support a four-story, 41-unit version of the Project, but strongly objected to the planned 55-foot building as inappropriate for the locale. Others, including neighbors, schools and community organizations, supported the Project as proposed and lauded the Center's mission and the diversity, vibrancy and quality of life it brings to the neighborhood.

On August 5, 2010, the San Francisco Planning Commission (the Commission) held a public hearing on the Draft. A number of neighbors participated and voiced concerns about the Project's size, scale, and visual character relative to the neighborhood. On April 14, 2011, the Department issued the "Comments and Responses" document.

3

The Comments and Responses contain public comments received on the Draft, responses to those comments, and responsive changes to the Draft. To address community concerns regarding the Project's visual character, the Project was modified to reduce the massing along the building's top floor and to break up its bulk into smaller components through different façade treatments and the incorporation of setbacks on the fourth and fifth floors. The Comments and Responses and Draft together comprise the EIR.

On April 28, 2011, the Commission certified the EIR and found it was adequate, accurate, and objective; reflected the independent judgment of the Commission; and complied with the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.).[2] On the same day, the Commission granted the Center's application for a conditional use permit allowing exceptions to planning code provisions concerning street trees, rear yard usable open space and dwelling unit exposure.

Plaintiffs appealed both the certification of the EIR and the conditional use permit to the San Francisco Board of Supervisors (the Board). In late June the Board approved the conditional use permit with several conditions related to controlling noise and mitigating the Project's impact on immediate neighbors. The Board also approved, and the mayor signed into law, an ordinance creating the Presidio-Sutter Special Use District to increase the allowed building height to 55' and density to up to 54 units. On July 7, the City issued a Notice of Determination under CEQA announcing its approval of the Project.

Plaintiffs filed a petition for a writ of mandate directing the City to vacate its decision to certify the EIR and its approval of the conditional use authorization and Special Use District. After a hearing on the merits, the superior court issued an order and statement of decision denying the petition. Plaintiffs filed this timely appeal from the ensuing judgment.

---

[2] All further statutory references are to the Public Resources Code unless otherwise indicated.

4

## DISCUSSION

### I. *The City Did Not Preapprove the Project in Violation of CEQA*

Relying on *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116 (*Save Tara*), plaintiffs contend the City impermissibly "preapproved" the Project prior to certification of the EIR. The contention is unpersuasive.

### A. The Legal Framework: *Save Tara*

Under CEQA, local agencies must prepare or cause to be prepared, certify as complete, and consider a final EIR *before* approving or disapproving any project they propose to "carry out or approve," if the project may have significant environmental effects. (§§ 21100, subd. (a), 21151, subd. (a); Cal. Code Regs., tit. 14, § 15004, subd. (a); *Save Tara, supra,* 45 Cal.4th at p. 121.) The question here is whether the City's involvement in the Project in the years preceding certification of the EIR constituted de facto approval of the Project and thus triggered the EIR requirement long before the City considered the Project's environmental impacts.

Identifying the point at which an agency approves a project for purposes of CEQA compliance involves a balancing of competing factors. (Cal. Code Regs., tit. 14, § 15004, subd. (b); *Save Tara, supra,* 45 Cal.4th at p. 116.) As the Supreme Court explained in *Save Tara*: "This court, like the CEQA Guidelines, has . . . recognized two considerations of legislative policy important to the timing of mandated EIR preparation: (1) that CEQA not be interpreted to require an EIR before the project is well enough defined to allow for meaningful environmental evaluation; and (2) that CEQA not be interpreted as allowing an EIR to be delayed beyond the time when it can, as a practical matter, serve its intended function of informing and guiding decision makers. [¶] The CEQA Guidelines define 'approval' as 'the decision by a public agency which commits the agency to a definite course of action in regard to a project.' (Cal. Code Regs., tit. 14, § 15352, subd. (a).) The problem is to determine when an agency's favoring of and assistance to a project ripens into a 'commit[ment].' To be consistent with CEQA's purposes, the line must be drawn neither so early that the burden of environmental review impedes the exploration and formulation of potentially meritorious projects, nor so late

5

that such review loses its power to influence key public decisions about those projects." (*Save Tara, supra*, at p. 130.)

In *Save Tara,* the project proponents maintained that only "unconditional agreements irrevocably vesting development rights" constitute "commitments" that amount to project approval within the meaning of CEQA. (*Save Tara, supra*, 45 Cal.4th at p. 134.) Under this view, "any development agreement, no matter how definite and detailed, even if accompanied by substantial financial assistance from the agency and other strong indications of agency commitment to the project, falls short of approval so long as it leaves final CEQA decisions to the agency's future discretion." (*Ibid.*) The Supreme Court rejected that view. "Such a rule would be inconsistent with the CEQA Guidelines' definition of approval as the agency's '*earliest* commitment' to the project. [Citations.] Just as CEQA itself requires environmental review before a project's approval, not necessarily its *final* approval [citation], so the guideline defines 'approval' as occurring when the agency *first* exercises its discretion to execute a contract or grant financial assistance, not when the *last* such discretionary decision is made." (*Ibid.*) "Moreover, limiting approval to unconditional agreements that irrevocably vest development rights would ignore what we have previously recognized, that postponing environmental analysis can permit 'bureaucratic and financial momentum' to build irresistibly behind a proposed project, 'thus providing a strong incentive to ignore environmental concerns.' " (*Id*. at p. 135.)

The court elaborated: "A public entity that, in theory, retains legal discretion to reject a proposed project may, by executing a detailed and definite agreement with the private developer and by lending its political and financial assistance to the project, have as a practical matter committed itself to the project. When an agency has not only expressed its inclination to favor a project, but has increased the political stakes by publicly defending it over objections, putting its official weight behind it, devoting substantial public resources to it, and announcing a detailed agreement to go forward with the project, the agency will not be easily deterred from taking whatever steps remain toward the project's final approval. [¶] For similar reasons, we have emphasized the

6

practical over the formal in deciding whether CEQA review can be postponed, insisting it be done early enough to serve, realistically, as a meaningful contribution to public decisions." (*Save Tara, supra,* 45 Cal.4th at p. 135.) The court thus rejected the proponents' argument that approval cannot occur before the vesting of development rights.

But the court also rejected the project opponent's view that "any agreement, conditional or unconditional, would be an 'approval' requiring prior preparation of CEQA documentation if at the time it was made the project was sufficiently well defined to provide ' "meaningful information for environmental assessment." ' " (*Save Tara, supra*, 45 Cal.4th at p. 136.) Such a rule "would be inconsistent with the CEQA Guidelines' definition of approval as involving a 'commit[ment]' by the agency. [Citation.] Agencies sometimes provide preliminary assistance to persons proposing a development in order that the proposal may be further explored, developed or evaluated. Not all such efforts require prior CEQA review. [Citation.] Moreover, privately conducted projects often need some form of government consent or assistance to get off the ground, sometimes long before they come up for formal approval. Approval, within the meaning of sections 21100 and 21151, cannot be equated with the agency's mere interest in, or inclination to support, a project, no matter how well defined. 'If having high esteem for a project before preparing an environmental impact report (EIR) nullifies the process, few public projects would withstand judicial scrutiny, since it is inevitable that the agency proposing a project will be favorably disposed toward it.' " (*Id.* at pp. 136-137.) "CEQA review was not intended to be only an afterthought to project approval, but neither was it intended to place unneeded obstacles in the path of project formulation and development." (*Id.* at p. 137; see also *Cedar Fair, L.P. v. City of Santa Clara* (2011) 194 Cal.App.4th 1150, 1162-1165 (*Cedar Fair*).)

Steering between the project proponent's Scylla and its opponent's Charybdis, the Supreme Court applied and elaborated upon "the general principle that before conducting CEQA review, agencies must not 'take any action' that significantly furthers a project 'in a manner that forecloses alternatives or mitigation measures that would ordinarily be part

7

of CEQA review of that public project.' (Cal. Code Regs., tit. 14, § 15004, subd. (b)(2)(B); accord, [*Concerned McCloud Citizens v. McCloud Community Services Dist.* (2007)] 147 Cal.App.4th at p. 196 [agreement not project approval because, inter alia, it 'did not restrict the District's discretion to consider any and all mitigation measures, including the "no project" alternative']; *Citizens for Responsible Government* [*v. City of Albany* (1997)], 56 Cal.App.4th at p. 1221 [development agreement was project approval because it limited city's power 'to consider the full range of alternatives and mitigation measures required by CEQA'].)" (*Save Tara*, *supra*, 45 Cal.4th at p. 138.) The critical question is " 'whether, as a practical matter, the agency has committed itself to the project as a whole or to any particular features, so as to effectively preclude any alternatives or mitigation measures that CEQA would otherwise require to be considered, including the alternative of not going forward with the project.' " (*Cedar Fair, supra*, 194 Cal.App.4th at pp. 1150, 1170, quoting *Save Tara, supra,* 45 Cal.4th at p. 139.)

We independently review the predominantly legal question whether the City approved the Project for purposes of CEQA before it conducted the requisite environmental review. (*Save Tara, supra*, 45 Cal.4th. at pp. 131-132 & fn. 10.)

**B.** ***Save Tara's Application to the City's Pre-Environmental Review Support of the Project***

Plaintiffs argue that the City preapproved the Project "through its many forms of bureaucratic and political endorsements" long before it certified the EIR. Specifically, they assert the City improperly committed itself to the project and foreclosed all other alternatives in 2010 when the Mayor's Office of Housing (MOH) "provided substantial funding for the Project, signed commitments for millions of dollars, assigned numerous senior staff to the Project, and coordinated and designed the Project long before CEQA review was conducted." These activities, in plaintiffs' view, amounted under *Save Tara* to de facto approval of the Project and therefore necessitated an EIR long before the City conducted the environmental review process. To analyze this claim, *Save Tara* cautions that "courts should look not only to the terms of the agreement but to the surrounding circumstances to determine whether, as a practical matter, the agency has committed

8

itself to the project as a whole or to any particular features, so as to effectively preclude any alternatives or mitigation measures that CEQA would otherwise require to be considered, including the alternative of not going forward with the project." (*Save Tara, supra*, 45 Cal.4th at p. 139.) Plaintiffs' claim does not demonstrate that the City committed itself to the project so as to preapprove it under the *Save Tara* test.

### 1. *The Predevelopment Loan*

In October 2010, the MOH executed an agreement to loan the Center $788,484, approximately four percent of the estimated $20 million needed to complete the project, for predevelopment activities comprised of architectural and engineering design, survey and appraisal preparation, preparation of environmental studies, CEQA and NEPA review, legal expenses, loan fees, cost estimates and associated administrative work. The Predevelopment Loan Agreement authorized a maximum disbursement of $550,000 prior to completion of all required CEQA review. Repayment of all loan funds with three percent interest was due in 55 years if the SUD received approval. If the SUD was not approved by June 30, 2011, the loan would come due immediately. The loan agreement explicitly stated that the City was not committing itself to the project: "By entering into this Agreement, MOH and Borrower intend to preserve the possibility of developing the Project as affordable housing by lending funds to Borrower for the Predevelopment Activities. The City does not, however, commit to or otherwise endorse the Project by entering into this Agreement. The Project remains subject to review by City agencies and City discretion to disapprove or modify the Project."

Plaintiffs contend the Predevelopment Loan Agreement impermissibly committed the City to the Project long before environmental review was done. Comparison to the predevelopment agreement in *Save Tara* illustrates the weakness of plaintiffs' contention. There, the project developer wanted to build approximately 35 low-income senior housing units on land owned by the City of West Hollywood. (*Save Tara, supra*, 45 Cal.4th at p. 122.) The city council approved a draft "Conditional Agreement for Conveyance and Development of Property" with the developer that included a $1 million loan from the city. (*Id*. at p. 124.) Approximately $475,000 of the loan was slated for

9

predevelopment costs, including environmental reports and governmental permits and fees, with the remaining "improvement portion" of the loan designated for the construction phase. (*Id*. at pp. 124-125.) The relocation of the existing tenants and all actions necessary to comply with CEQA were to occur before the city would convey the property to the developer and the construction phase would begin. The draft agreement stated that its purpose was " 'caus[ing] the reuse and redevelopment of [the property] with affordable housing for seniors and a neighborhood pocket park, while retaining the historic integrity of the Site.' " (*Id*. at p. 124.)

The draft agreement subjected the city's obligation to convey the property and disburse the "improvement portion" of the loan subject to several conditions precedent, including the satisfaction of all CEQA requirements " 'as reasonably determined by the City Manager.' " (*Save Tara, supra*, 45 Cal.4th at p. 124.) The city manager, however, could waive these conditions. After the project opponents asserted the city's failure to prepare an EIR before approving the loan and draft agreement violated CEQA, the city and developer executed a revised agreement that removed the city manager's ability to waive CEQA compliance and stated the city retained discretion over " 'any actions necessary to comply with CEQA' " and had no duty to approve any CEQA documents. The revised agreement specified that the developer was to hire a relocation consultant within 30 days to begin the process of relocating tenants. (*Id.* at pp. 125-126.)

The Supreme Court determined from the agreements and surrounding circumstances that the city's approval of the draft agreement and its execution of the revised agreement constituted project approval under CEQA. (*Save Tara, supra*, 45 Cal.4th at p. 140.) In reaching that determination, the court relied on the "forthrightly" stated purpose in both development agreements, "to 'cause the reuse and redevelopment' of [the property] in accordance with the project as outlined in the agreements and in the earlier HUD grant application." Similarly, a city council resolution approving the draft agreement stated the intent to " 'facilitate development of the project'—while allowing further public input on 'the design of project elements.' " (*Id*. at p. 140.) It was also significant that the developer was not required to repay the nearly half million dollar

10

predevelopment portion of the loan unless the city gave the project final approval. (*Id*. at p. 140.) If it did not, the money advanced for predevelopment costs would be a total loss. (*Ibid*.)

In addition, the draft agreement "significantly circumscribed" the city's authority to enforce CEQA requirements empowering the city manager to "reasonably determine[]" whether they had been met, "language that could have left City open to charges it acted unreasonably, had it ultimately declined to certify the EIR or make any needed CEQA findings. (*Save Tara, supra*, 45 Cal.4th at p. 140.) It also omitted any provision that would allow an appeal of the city manager's decision to the city council, thereby improperly delegating the council's responsibility under CEQA. (*Id*. at p. 141; see also *Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296, 307 [permit condition requiring applicant to submit environmental study to the planning commission and adopt any mitigation measures formulated by commission staff improperly delegated CEQA responsibility to staff and postponed environmental review].) Despite the subsequent revision, the city council's approval of the draft agreement demonstrated its "willingness to give up further authority over CEQA compliance in favor of dependence on the city manager's determination. Given that history, as well as the other circumstances discussed below, City's 'apprehensive citizenry' [citation] could be forgiven if they were skeptical as to whether the city council would give adverse impacts disclosed in the EIR full consideration before finally approving the project." (*Save Tara, supra,* at p. 141.)

The court also determined that certain statements by city officials and staff indicated the city was committed to the project. (*Save Tara, supra*, 45 Cal.4th at pp. 141-142). Finally, the court found it significant that the city proceeded with tenant relocation on the assumption the redevelopment project would go forward as proposed, and expressly anticipated that the developer would complete the relocation of tenants *before* the city certified an EIR and gave final project approval. All of this "tends strongly to show that City's commitment to the . . . project was not contingent on review of an EIR." (*Id*. at p. 142.) In summary, the court concluded, the city's public announcements that it

11

was determined to proceed with the development, its preparations to relocate the existing tenants from the property, its large at-risk financial contribution to the project, and its willingness to commit itself to going forward if the city manager found CEQA requirements were satisfied demonstrated that the city impermissibly "committed itself to a definite course of action regarding the project before fully evaluating its environmental effects." (*Id*. at p. 142.)

Significant differences from *Save Tara* persuade us the same is not true here. While the contract language is not dispositive, the loan agreement unambiguously states that the Project remained subject to review by City agencies and the City did not commit to or otherwise endorse the project by financing its predevelopment activities. The City's financial support of the Project was expressly restricted to such exploratory and development costs recognized in *Save Tara* not to require CEQA review. (*Save Tara, supra*, 45 Cal.4th at p. 136 ["Agencies sometimes provide preliminary assistance to persons proposing a development in order that the proposal may be further explored, developed or evaluated. Not all such efforts require prior CEQA review"]; see also Cal. Code Regs., tit. 14, § 15262 [projects involving only feasibility or planning studies do not require CEQA review].) This is very different from *Save Tara*, where loan funds were to be used to relocate the existing tenants *before* final project approval. (*Save Tara, supra*, at p. 142.) As the Supreme Court observed, "[r]elocation of tenants is a significant step in a redevelopment project's progress, and one that is likely to be irreversible." Thus, West Hollywood's willingness to immediately begin that process and to complete it before certifying an EIR and approving the project "tends strongly to show that City's commitment to the . . . project was not contingent on review of an EIR." (*Ibid*.) But, in this case, the activities funded by the City's loan are limited to studies, are not irreversible, and will not cause any disruptions of the current activities on the Site or physical changes in the environment.

Also in contrast to *Save Tara,* the Center must repay the loan whether or not the project is approved. Plaintiffs contend that even though the loan agreement requires repayment whether or not the project goes forward, the City in fact does not expect and

12

will not require repayment because it knows the Center is financially dependent on the City and "completely without assets or anyway [*sic*] to repay such 'contingent loans' " unless the project is approved. But these claims are unsupported by the record. Financial statements for the Center from 2005 through 2008 show a modest but consistent annual budget of approximately $650,000 to over $900,000, with various funding sources such as private foundations, grants from City agencies and others, program fees, rental income, and private contributions. MOH, a regular lender to nonprofit housing development organizations, evaluated the Center's audited financial statements in an extensive and detailed loan evaluation to the Citywide Affordable Housing Loan Committee and concluded that its ratio of assets to liabilities for 2008 indicated financial stability. Moreover, the Center has shown itself capable in the past of beneficially structuring its financial picture, as, for example, in its relationship with Drew College Preparatory School (Drew), *post*, and the record presents no solid reason to believe it would be unable to do so again. In any event, the predevelopment loan is secured by a deed of trust against the Center's property, which apparently is not otherwise encumbered. So, if the Project is not approved, and the Center were unable to secure financing or other sources of funding to repay the predevelopment loan, the City can satisfy repayment through the remedies, including foreclosure, provided in the deed of trust. Plaintiffs' assertion that the City would do no such thing is mere speculation.

Plaintiffs paint a distorted picture of the Center's financial situation when they suggest the City loan is in addition to what plaintiffs characterize as a $426,000 loan from Drew. The Center generates income to support its programs by leasing gymnasium space to Drew and other organizations. In October 2007, Drew paid off the Center's preexisting $426,932 mortgage from Sequoia National Bank in exchange for priority leasing rights to the gymnasium. Drew valued the leasing rights at $200,000, which was donated to the Center, and the Center agreed to repay the remaining $226,932 balance under an unsecured promissory note, with monthly payments of $1,517.47 offset against Drew's lease payments. None of this supports plaintiffs' depiction of the Center as so

13

deeply indebted that the City cannot reasonably expect repayment unless it approves the Project.

We are also unpersuaded by plaintiffs' claim that the Center committed itself to the Project when it accepted the City's loans because the deed of trust requires the site to be used for affordable housing for the next 55 years. Plaintiffs argue the parties "impermissibly committed to providing a low-income housing development at [the Center's] site," foreclosing all other reasonable alternative uses prior to environmental review. Plaintiffs forfeited this argument by failing to raise it in their opening brief, and it is meritless. The City's support for the low-income housing does not demonstrate that it committed itself to the Project as proposed and foreclosed all other alternatives prior to environmental review—including, for example, the "no-project" option and the scaled-down version supported by many of the objecting neighbors and neighborhood groups. Even in *Save Tara*, the city's commitment to developing senior housing was only one of many circumstances that demonstrated the city's pre-review commitment to the proposed project, including statements by top city officials and its loan of nearly half a million dollars with no provision for repayment were the project not approved. (*Save Tara, supra*, 45 Cal.4th at pp. 140-141.) *Save Tara* does *not* hold that a city's requirement that a public private redevelopment project provide a specific public service, such as senior or low-income housing, is tantamount to project approval.

### 2. *The Special Use District Ordinance*

When a developer includes a certain percentage of affordable housing in a development, state law requires local jurisdictions to grant a "density bonus" and other incentives, such as reduced setbacks and parking requirements. (Gov. Code, § 65915.)[3] For housing developments comprised entirely of low-income units, as here, Government Code section 65915 mandates that the City provide a 35 percent density bonus over its otherwise maximum allowable residential density. (Gov. Code, § 65915, subd. (f)(1).) In order to meet its obligations under state law, the City enables affordable housing

---

[3] "Density bonus" means a density increase over the otherwise maximum allowable residential density. (Gov. Code, § 65915, subd. (f).)

14

developers to pursue additional density through the creation of Special Use Districts (SUDs).

Before it proposed the Project, the Center was located in a low-density, residential and mixed zoning district with a maximum building height allowance of 40 feet. This zoning designation permitted a planned unit development of 36 units at the site. On September 14, 2010, Supervisor Alioto-Pier introduced an SUD ordinance to increase the allowed height to 55' and the density to more than 54 units, depending on the inclusion of affordable housing as a component of development. On April 28, 2011, the Commission recommended that the City approve an ordinance to amend the City's zoning map to reflect the boundaries of the new Presidio-Sutter SUD and change the existing height limit from 40' to 55'. The Board of Supervisors approved the ordinance on June 28.

Plaintiffs argue that Supervisor Alioto-Pier's introduction of the Special Use District ordinance constituted "legislative action" amounting to project approval under CEQA. Their argument misstates the law. Plaintiffs support their argument with the final sentence of section 15352, subdivision (a) of the Guidelines for Implementation of the California Environmental Quality Act (Cal. Code Regs, tit. 14, § 15000 et seq.), and assert that "environmental review must be undertaken before a City proposes or adopts any motion or ordinance which would affect a proposed project." In full, section 15352(a) says: " 'Approval' means the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person. The exact date of approval of any project is a matter determined by each public agency according to its rules, regulations, and ordinances. *Legislative action in regard to a project often constitutes approval*." (Cal. Code Regs., tit. 14, § 15352, subd. (a), italics added.) But "often" does not mean "always," and the introduction of legislation is not the equivalent of a "decision by a public agency," let alone a decision that "commits" it to "a definite course of action." Plaintiffs provide no authority for their claim that a supervisor's introduction of proposed legislation for consideration by the board is the same, for CEQA purposes, as the board's approval of an ordinance. To the contrary, the city charter specifies that the board of supervisors can act "only by written

15

ordinance or resolution"—which requires the vote of a majority of its members. (S.F. Charter, § 2.105.) In this case, approval occurred on June 28, 2011, two months *after* the EIR was certified.

### 3. *Other Circumstances*

Plaintiffs contend the commitment of staff resources and public statements by the MOH in support of the Project also demonstrate City commitment to and approval of the Project prior to environmental review. Here too, we are unpersuaded.

First, plaintiffs assert that notes from a November 28, 2006, planning department meeting show Supervisor Alioto-Pier, and, impliedly, the City, was already committed to the Project by that date. The relevant notes state: "**Background:** To demolish community center and construct a new 65' mixed-use building with work force and affordable housing and community center. Environmental Review application has been filed. [¶] **Case Issues:** Project would require changing the height district from 40-X to at least 70. Supervision [*sic*] Alioto-Pier has indicated that she supports this project and will initiate the height change. Staff has serious concerns regarding the proposed height (the Director agrees with staff). The project sponsor has been advised of these concerns. [¶] **Recommendations:** At the last project review meeting, it was suggested that the Director express staff concerns to the Supervisor."

These notes do not demonstrate the City's preapproval of the Project. As discussed above, one supervisor's advocacy for the Center's expansion is not equivalent to action, let alone approval, by the City. Moreover, the cited notes show the proposal was a work in progress. Planning Department staff and its director believed the Project as then proposed was too high and legislation introduced in 2010 reduced it to 55 feet. Indeed, a competing ordinance proposed in 2011 but withdrawn would have reduced that by yet another 10 feet. Plaintiffs' assertion that the proposal by Supervisor Alioto-Pier in 2006 reveals the City was already committed to a specific plan cannot be squared with the administrative record.

A series of May 2010 internal MOH emails plaintiffs rely upon as evidence of preapproval are no more persuasive. Plaintiffs assert these communications show that

16

"[t]he approvals, the CEQA process, and the outcome of Project review [were] assumed and assured . . . as the staff at MOH acts as the owner and project sponsor adjusting the design and coordinating the approval (not the review) with Planning. . . ." We disagree. They show that MOH project staff, understandably, had significant involvement and input in the Project's design. This is neither unusual, suspicious, nor demonstrative of preapproval. As *Cedar Fair* and other cases have recognized, "[t]he modern phenomenon of 'public-private partnerships' for development makes the time of 'approval' under CEQA more difficult to ascertain since a local agency may be a vocal and vigorous advocate of a proposed project as well as an approving agency. But 'an agency does not commit itself to a project "simply by being a proponent or advocate of the project. . . ." ' " (*Cedar Fair, supra,* 194 Cal.App.4th at p. 1173; see also *City of Vernon v. Board of Harbor Comrs.* (1998) 63 Cal.App.4th 677, 688 ["If having high esteem for a project before preparing an [EIR] nullifies the process, few public projects would withstand judicial scrutiny, since it is inevitable that the agency proposing a project will be favorably disposed toward it"].)

Plaintiffs' reliance on various "public statements" as evidence the City approved the project before it conducted environmental review is no more persuasive. Three such statements are flyers or brochures issued *by the Center—* not the City—about its proposed expansion. Of these, one includes a picture of Supervisor Alioto-Pier and quotes her as saying, "The Booker T Washington Community Services Center is an established and vital fixture in District 2. I will continue to support all the great work it does for families and children." Another appears to be an informational flyer about the Center's expansion plans that contains a solicitation of donations and invitation to the community to submit comments and suggestions, while the third, dated October 2010, announces a "kickoff celebration for the new Booker T. Washington Community Service Center." None of these were generated by the City, and they give no indication that the City had in any way approved the Project or foreclosed alternatives to it.

Lastly, plaintiffs point to an April 2013 e-mail from Rachel Antrobus, the executive director of the non-profit organization TAYSF (Transitional Age Youth

17

San Francisco) that originated from an sfgov.org e-mail address, as evidence of the City's commitment to the specific Project. Plaintiffs concede that Antrobus is not a City employee. The e-mail explains that TAYSF staff inadvertently sent out sample letters of support for the Project from Antrobus's sfgov.org address rather than from the organization's taysf.org address, after the Project's developer asked TAYSF to facilitate gathering letters of support for the April 28, 2011, planning commission meeting. Antrobus acknowledged that sending the e-mail, particularly from a city e-mail address, was both accidental and inappropriate, particularly since it supported a mistaken perception that she is a city employee. Here, again, one communication from the head of a nonprofit organization that advocates for transitional age youth does not show that the City had approved of or committed to the Project.

These "public statements" stand in sharp contrast to those said to demonstrate West Hollywood's premature commitment to the project at issue in *Save Tara*. The statements in *Save Tara* included the city manager's statements that the city " 'has approved the sale of the property' " and " 'will commit' up to $1 million in financial aid;" the mayor's announcement that a HUD grant " 'will be used' " for the project; statements in the city's newsletter that the city " 'will redevelop the property;' " and the city's housing manager's statement at a city council meeting that "while there were 'options to consider' regarding project design, options for other uses of the property (as a park, library, or cultural center) had already been ruled out." (*Save Tara, supra*, 45 Cal.4th at pp. 141-142.) Although "expressions of enthusiasm for a project by an agency's staff members should not be confused with official approval," and that such statements in isolation "could rarely, if ever, be deemed approvals for CEQA purposes," the court observed, the public statements in *Save Tara* were from highly authoritative sources. (*Id.* at p. 142, fn. 13.)

Not so here. Neither Supervisor Alioto-Pier's advocacy of the Project, a lone e-mail from a nonprofit organization soliciting support for it, albeit inadvertently sent from a City e-mail address, nor the Center's publications promoting the Project indicate the City improperly committed to the Project prior to the requisite environmental review.

18

## II. The EIR is Sufficient

Plaintiffs levy essentially two challenges to the adequacy of the EIR: that it fails to accurately depict the Project's vicinity, and that it does not address an offsite or relocation project alternative. Neither has merit.

### A. *Legal Standards*

"The court's inquiry in an action to set aside an agency's decision under CEQA extends only to whether the agency committed a prejudicial abuse of discretion. In this regard, although a court does not pass upon the correctness of an EIR's environmental conclusions, it does determine whether the EIR is sufficient as an informational document. [Citations.] . . . [¶] . . . An adequate EIR must be 'prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences.' [Citation.] It 'must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' [Citation.] [¶] CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive. [Citation.] . . . .' The absence of information in an EIR . . . does not per se constitute a prejudicial abuse of discretion. [Citation.] A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process." (*Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 711-712; see also *Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1390-1393.)

" 'Technical perfection is not required; the courts have looked not for an exhaustive analysis but for adequacy, completeness and a good-faith effort at full disclosure.' " (*Concerned Citizens of South Central L.A. v. Los Angeles Unified School Dist.* (1994) 24 Cal.App.4th 826, 835-836; 1 Manaster & Selmi, Cal. Environmental Law and Land Use Practice (Matthew Bender 2010) § 23.04[2][e][iii].) The EIR is presumed

adequate, and it is the challenger's burden to prove it is not.  (*Concerned Citizens of South Central L.A., supra*, at p. 836.)

### B.  The EIR Adequately Describes the Project Baseline.

"Before the impacts of a project can be assessed and mitigation measures considered, an EIR must describe the existing environment.  It is only against this baseline that any significant environmental effects can be determined."  (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 952; Cal. Code Regs., tit. 14, § 15125, subd. (a).)  Plaintiffs assert the baseline used in the EIR is inadequate.  But the single flaw they identify is a graphical depiction of the surrounding area that erroneously identifies both two and three-story buildings as all three-story.  There is no basis to conclude this graphic interfered with informed decisionmaking and public participation, and it does not establish that approval of the EIR was an abuse of discretion.

Multiple written descriptions of the Project vicinity in the Draft identify the prevalence of two and three-story buildings.  In describing the Project setting and again in addressing its environmental setting and impacts, the Draft states:  "The project area contains primarily residential uses along with some public, commercial, and retail uses. Residential uses occupy all of the lots on the project block (other than the project site) and most lots on the surrounding blocks, with the exception of the block across Presidio Avenue from the project site, where the bus storage depot of the San Francisco Municipal Railway (MUNI) Presidio Yard is located.  Residential uses in the project area *range from single-story, single-family homes to four-story multi-family buildings*, many of which were constructed in architectural styles typical for the late nineteenth or early twentieth centuries.  Building heights are variable but most are approximately 15 to 45 feet in height. *The predominant scale in the site's vicinity is two-to three-stories* (see **Figure 12,** Building Heights on Project Block and Surrounding Facades on page IV-5). [¶] Residential uses surround the subject property to the north, south and east.  *To the south is a two-story multi-family building, to the east is a one-story single-family home* and across Sutter Street, to the north, is a four-story (45 foot) multi-family apartment

building.  As mentioned above, across Presidio Avenue and west of the project site is the MUNI Presidio Yard, which extends from Geary Boulevard on the South to Euclid Avenue on the north.  The southern portion of the yard is occupied by a bus repair building (two and three stories and approximately 45-50 feet in height)."  (Italics added.)

Similarly, the Draft's analysis of impacts on the surrounding neighborhood observes:  "The height and bulk of the new building would be noticeably greater than the smaller-scale and *predominantly two- to three-story* residential buildings on the project block.  **Figure 12** on page IV-5 illustrates the generalized heights of the buildings on the project block in terms of building stories, where each residential floor is about 10 feet, and on the surrounding adjacent blocks.  The community center component of the proposed project would be three stories, or approximately 20 feet, taller than the existing adjacent two-story building on Presidio Avenue and the residential component of the proposed project would be five stories taller than the existing adjacent building at 2755 Sutter Street. . . . [¶] . . . [¶] However, the proposed five-story (above ground) building would be only slightly taller or similar in height to other residential and non-residential buildings in the general project area, which in addition to one-and two-story single- and multi-family homes, includes a four-story multi-family apartment building . . ., the large two- and three-story (high bay) MUNI bus depot across Presidio Avenue from the project site, and in the greater project vicinity [an] approximately four-story commercial development (The City Center) at the corner of Presidio Avenue and Geary Boulevard two blocks south of the project site, and the approximately eight-story hospital building (Kaiser Hospital, St. Joseph's campus) on the corner of Lyon Street and Geary Boulevard two blocks southeast of the project site . . . ."

Similar descriptions appear throughout the Draft.  For example, a section addressed to the surrounding neighborhood's visual character notes that "[b]uildings on the project block range between one and four stories, although the majority of the structures are multi-level buildings, two to three stories tall, or approximately 15 to 45 feet in height."  The nearby Laurel Heights neighborhood is described as "characterized by fairly uniform residential building sizes, the majority of which are in the two- to three-

21

stories range." Addressing the Project's visual impacts on the character of the site, the Draft emphasized that it would be taller than both the existing structure and the immediately adjacent buildings, including a one-story single family home at 2755 Sutter Street, just east of the project, and a two-story residential building just to the north.

Plaintiffs' characterization of "Figure 12" is correct. It erroneously identifies all two-story buildings in the immediate vicinity as three-story buildings. But, the Draft as a whole adequately described the surrounding vicinity and, specifically with reference to plaintiffs' complaint, the heights of adjacent buildings. Moreover, plaintiffs raised the error in Figure 12 in their appeal from certification of the EIR. The Planning Department agreed that Figure 12 mistakenly omitted two-story structures, provided a corrected version, and referred to additional figures and photographs in the Comments and Responses that illustrated and discussed building height and bulk in the surrounding area, all of which was available to the public and the City when the EIR was under review. Plaintiffs acknowledge that the corrected version was before the Board of Supervisors when it affirmed the certification of the EIR. "A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process." (*Kings County Farm Bureau v. City of Hanford, supra,* 221 Cal.App.3d at pp. 711-712; see also *Association of Irritated Residents v. County of Madera, supra,* 107 Cal.App.4th at pp. 1390-1393.) No such abuse of discretion occurred here.

### C. Analysis of a Relocation or Off-Site Alternative Was Not Required

Plaintiffs also assert the EIR is inadequate because it does not evaluate relocating the Center's existing facility to a new site as an alternative to demolition. This assertion, too, lacks merit. "[T]here is no rule requiring an EIR to explore off-site project alternatives in every case. As stated in the Guidelines: 'An EIR shall describe a range of reasonable alternatives to the project, *or to the location of the project*, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives." [Citation.] As this implies, 'an agency may evaluate on-site

22

alternatives, off-site alternatives, or both.' [Citation.] The Guidelines thus do not require analysis of off-site alternatives in every case. Nor does any statutory provision in CEQA 'expressly require a discussion of alternative project locations.' " (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 993.) The selection of alternatives for evaluation is judged against a rule of reason. (*Id.* at p. 980; *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 565-566.)

The City acted reasonably here. First, moving the Center away from its present site would undermine the City's fundamental objective of continuing and expanding the services the Center offers on site to its local community. Moreover, the Center is a non-profit organization which, while fortunate to own the site on which its facility is located, lacks the fiscal means to reasonably acquire or control an alternative site. "[A] project alternative which cannot be feasibly accomplished need not be extensively considered. A feasible alternative is one which can be "accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." [Citations.] Surely whether a property is owned or can reasonably be acquired by the project proponent has a strong bearing on the likelihood of a project's ultimate cost and the chances for an expeditious and 'successful accomplishment.' " (*Citizens of Goleta Valley v. Board of Supervisors, supra*, 52 Cal.3d at p. 574; see also *Save Our Residential Environment v. City of West Hollywood* (1992) 9 Cal.App.4th 1745, 1753-1754 & fn.1; Cal. Code Regs., tit. 14, § 15126.6, subd. (f)(1) [whether project proponent can reasonably acquire, control or otherwise have access to the alternative site is relevant to feasibility of alternatives].) Under these circumstances, the City reasonably determined an alternative that would require the Center to move away from the community it has historically served to an unidentified property, in an unidentified location, to be acquired by unknown means, was not feasible.

### III. The City Properly Rejected the Code Compliant Alternative

The EIR evaluated a "Code Compliant" alternative that would reduce the scope of the Project to a four-story structure, reduce the number of affordable housing units from 48 to 30, and eliminate the specialized housing for transitional-age youth. Plaintiffs

23

assert that the City's rejection of this option as infeasible was unsupported by substantial evidence. However, ample evidence in the administrative record supports the City's determination.

"CEQA contains a 'substantive mandate' requiring public agencies to refrain from approving projects with significant environmental effects if 'there are *feasible* alternatives or *mitigation measures'* that can substantially lessen or avoid those effects." (*County of San Diego v. Grossmont-Cuyamaca Community College Dist.* (2006) 141 Cal.App.4th 86, 98, italics omitted.) "Feasible," for purposes of CEQA, means "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social, and technological factors." (§ 21061.1; Cal. Code Regs., tit. 14, § 15364.) Here, the City determined the Code Compliant alternative was financially infeasible largely because the smaller development would have a negative operating cash flow.[4] Substantial evidence supports that determination. Operating budget analyses prepared for a 41-unit development, or 11 *more* units than the Code Compliant Alternative, established that the Project would generate an $11,937 annual deficit. Staff at the MOH testified that such a 41-unit alternative "would cost more, primarily because of the operations and that because many of the operating costs are fixed and yet the tenants rents would be less—the cash flow would go negative starting year one." There was additional evidence that a 25-unit development would produce an annual deficit of $77,569.

The City explored, but rejected, the possibility of covering such a deficit with public funding. City staff testified the City could provide the Center with a $500,000 capitalized operating reserve to cover the deficit generated by a 41-unit project over 20 years. That approach, however, would take $500,000 of City money away from other affordable housing projects, and would require the Center to cover a substantial

_____

[4] The City also found that this alternative would require a bulkier building that would be both less harmonious with the adjacent buildings and of insufficient height to house a fully functional gymnasium.

24

unsubsidized operating deficit after the 20-year period. As the Center's board chair testified, "a building reduced to four stories with 41 units would cause an unsustainable operating deficit that neither our center nor the city can afford" and "would leave the center strapped after 20 years . . . with no ability to maintain those affordable housing units." Similarly, MOH staff testified that sound public policy supported a financially self-sustaining development that would create more affordable housing without additional public funds. These points are well-documented in the administrative record, and support the City's finding that the Code Compliant Alternative was infeasible. (See, e.g., *San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 695 [upholding rejection of alternatives that would require increased public assistance]; *Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 715 [alternative infeasible because lower-density project would result in more expensive houses and defeat the goal of providing affordable single-family housing].)

### IV. The City Properly Issued the Conditional Use Permit

Plaintiffs contend the City improperly issued the Center's conditional use permit because the Project is not necessary and desirable for, and is inconsistent with, the neighborhood. The narrow question on appeal is whether the contrary findings by the Commission and the Board are supported by substantial evidence. (*Upton v. Gray* (1969) 269 Cal.App.2d 352, 359.)

Section 303 of the San Francisco Planning Code sets forth the criteria for approval of conditional use applications. The first of these is that "the proposed use or feature, at the size and intensity contemplated and at the proposed location, will provide a development that is necessary or desirable for, and compatible with, the neighborhood or the community." (S.F. Planning Code, § 303, subd.(c)(1).) The Commission must also consider whether the proposed use will be detrimental to the health, safety, convenience or general welfare of people who live or work in the vicinity, or injurious to property due to its effects on such conditions as traffic, noise, glare, or light. In addition, it must find

the conditional use does not adversely affect the General Plan. (S.F. Planning Code, § 303, subds. (c)(2), (c)(3).)

Here, the Commission considered both the immediate neighborhood and its broader vicinity, and found, based on substantial evidence, that the Project would not be detrimental to the public health, safety and welfare or adversely affect the General Plan. It found the Project was necessary or desirable because it would continue and expand the services the Center provides to low- and very low-income individuals and provide needed affordable housing, particularly for at-risk emancipated foster youth. The record supports the City's pressing need for these services.

Plaintiffs nonetheless claim, without elaboration or explanation, that the City "cannot establish that the relevant uses or features of [the Center's] facility within this particular zone constitute a legitimate interest, bearing a reasonable relation to the public welfare." If their point is that the City lacks a legitimate interest in providing affordable housing, they are very wrong. (See, e.g., *Alfaro v. Community Housing Improvement System & Planning Assn., Inc.* (2009) 171 Cal.App.4th 1356, 1373-1374 [citing California statutes and case law establishing affordable housing as public priority].)

Plaintiffs also argue that the conditional use cannot be "necessary and desirable" because there are neighbors who live within 300 feet who oppose the Project. This argument conflates a planning code requirement that all property owners within 300 feet of the affected site be notified of hearings on conditional use applications (S.F. Planning Code, § 306.3, subd. (a)(2)), with the legal criteria for approval of a conditional use permit specified in San Francisco Planning Code section 303, subdivision (c). Here, after considering extensive public input and an exhaustive administrative record addressing the Project's effect on the neighborhood and community, both the Commission and the Board properly exercised their discretion and found the Project satisfied those criteria.

## V. The City Properly Found the Project is Consistent With the General Plan

Finally, plaintiffs contend the Project is inconsistent with San Francisco's General Plan because it is incompatible with, and fails to preserve, the existing neighborhood character. Here, too, their argument is unpersuasive.

26

**A.** *Legal Principles*

The relevant legal standards are well settled. "The standard for judicial review of administrative decisions by local public agencies with respect to consistency with applicable general plans 'is whether the local adopting agency has acted arbitrarily, capriciously, or without evidentiary basis.' [Citation.] 'A city's findings that [a] project is consistent with its general plan can be reversed only if [they are] based on evidence from which no reasonable person could have reached the same conclusion. [Citation.]' [Citation.]" (*San Franciscans Upholding the Downtown Plan v. City & County of San Francisco, supra,* 102 Cal.App.4th at p. 677) . . . . Moreover, "courts accord great deference to a local governmental agency's determination of consistency with its own general plan, recognizing that 'the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citations.] Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes. [Citations.] A reviewing court's role "is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies." [Citation.]' [Citation.] [¶] Moreover, state law does not require precise conformity of a proposed project with the land use designation for a site, or an exact match between the project and the applicable general plan. [Citations.] Instead, a finding of consistency requires only that the proposed project be '*compatible* with the objectives, policies, general land uses, and programs specified in' the applicable plan. [Citation.] The courts have interpreted this provision as requiring that a project be ' "in agreement or harmony with" ' the terms of the applicable plan, not in rigid conformity with every detail thereof." (*Id*. at pp. 677-678.)

Here, the City considered the relevant policies and objectives and concluded the Project is, on balance, consistent with its General Plan. There were explicit findings that, for example, the Project was consistent with the General Plan's objectives and policies of

promoting harmony in the visual relationship and transitions between new and older buildings; relating the bulk of buildings to the prevailing scale of development to avoid an overwhelming or dominating appearance in new construction; protecting residential areas from excessive traffic; locating in-fill housing on appropriate sites in established residential neighborhoods; and supporting and improving the City's affordable housing stock. The City also considered how the Project would promote City objectives of assuring neighborhood residents access to needed services and providing a focus for neighborhood activities, and using the public transit system as a means for guiding development.

Plaintiffs' specific criticisms are primarily with the Project's scale and design. But the City considered those issues, along with many others posed by the Center's expansion, and determined the Project is, on balance, consistent with the General Plan. That is what the law requires (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco, supra,* 102 Cal.App.4th at pp. 677-678), and it is not our role to second guess the City's determination.

### VI. Plaintiffs' Claim of Procedural Errors is Waived and Meritless

Plaintiffs asserted in the "Summary of Argument" section of their opening brief and at oral argument that the trial court also "committed a host of prejudicial procedural and substantive errors," although the only purported error they identified is the trial court's failure to follow the procedural rules in response to their request for a statement of decision. Nowhere in their brief do we find any actual argument to support this claim of error. "We are not required to search the record to ascertain whether it contains support for [appellant's] contentions. [Citation]. Further, it is established that '. . . an appellate brief "should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.' [Citation.] [¶] . . . This court is not inclined to act as counsel for . . . appellant and furnish a legal argument" as to how the trial court's rulings were erroneous. (*Mansell v. Board of Administration (*1994) 30 Cal.App.4th 539, 545-546.) Although plaintiffs' reply brief fleshes out the legal and factual basis of this

28

procedural error argument, the discussion does not compensate for its omission from their opening brief. "Obvious considerations of fairness in argument demand that the appellant present all of his or her points in the opening brief. To withhold a point until the closing brief would deprive the respondent of an opportunity to answer it or require the effort and delay of an additional brief by permission." (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 723, p. 790; see also *Granite Construction Co.* v. *American Motorists Ins. Co.* (1994) 29 Cal.App.4th 658, 667, fn. 8.) We take these principles seriously, and counsel who practice before this court should do the same.

In any event, plaintiffs are wrong. "A superior court sitting as a court of review in a CEQA proceeding is not required to issue a 'statement of decision' as that term is used in Code of Civil Procedure sections 632 and 634. (See 2 Kostka & Zischke, Practice under the Cal. Environmental Quality Act (Cont.Ed.Bar 2d ed. 2011) § 23.116, p. 1262.) Conversely, a superior court that chooses to issue a written document explaining its decision to grant or deny a writ of mandate in a CEQA proceeding is not prohibited from labeling the document 'statement of decision.' Regardless of the label used, the rights, obligations and procedures set forth in Code of Civil Procedure sections 632 and 634 and California Rules of Court, rule 3.1590 do not apply to any such document issued by the court in a CEQA writ proceeding." (*Consolidated Irrigation Dist. v. City of Selma* (2012) 204 Cal.App.4th 187, 196.)

## DISPOSITION

The judgment is affirmed. Respondents and real party in interest are entitled to costs on appeal. (Cal. Rules of Court, rule 8.278.)

29

_____
Siggins, J.

We concur:


_____
Pollak, Acting P.J.


_____
Jenkins, J.

*Neighbors for Fair Planning v. City and County of San Francisco, A135745*

**CERTIFIED FOR PARTIAL PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIRST APPELLATE DISTRICT**

**DIVISION THREE**

| | |
|---|---|
| NEIGHBORS FOR FAIR PLANNING,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO,<br><br>    Defendant and Respondent;<br><br>BOOKER T. WASHINGTON COMMUNITY SERVICE CENTER,<br><br>    Real Party in Interest. | A135745<br><br>(City & County of San Francisco Super. Ct. No. CPF-11-511499)<br><br>ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION |

THE COURT:

The requests to publish portions of the above-entitled opinion filed May 31, 2013, are granted. For good cause it now appears that the opinion should be published in the Official Reports, with the exception of parts II-VI, as they do not meet the standards for publication contained in rule 8.1110 of the California Rules of Court.

_____

Pollak, Acting  P.J.

31

| | |
|---|---|
| Trial Court: | San Francisco County Superior Court |
| Trial Judge: | Hon. Teri L. Jackson |
| Counsel for Petitioner and Appellant:<br>Neighbors for Fair Planning | Stephen M. Williams<br>LAW OFFICE OF STEPHEN M.<br>WILLIAMS |
| Counsel for Respondents:<br>City and County of San Francisco | Dennis J. Herrera<br>CITY ATTORNEY<br><br>Kristen A. Jensen<br>Susan Cleveland-Knowles<br>DEPUTY CITY ATTORNEYS |
| Counsel for Real Party in Interest:<br>Booker T. Washington Community<br>Service Center | Denis F. Shanagher<br>Alice Suet Yee Barkley<br>Jennifer Chavez<br>MCKENNA LONG & ALDRIDGE LLP<br><br>Anne Morrison Epperly |

*Neighbors for Fair Planning v. City and County of San Francisco, A135745*